FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 24, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

PAIGE K.,[1]

        Plaintiff,

   v.

FRANK BISIGNANO,
Commissioner of Social Security,

        Defendant.

No.   4:25-cv-5009-EFS

**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR FURTHER PROCEEDINGS**

     Plaintiff Paige K. asks the Court to reverse the Administrative Law Judge's (ALJ) denial of Title 2 and Title 16 benefits. Plaintiff claims she is unable to work due to lumbar spine degenerative disc disease, a congenital pars defect, neuropathy in her hands and feet, Reynaud's phenomenon, major depressive disorder, generalized anxiety disorder, attention-deficit hyperactivity disorder, and a substance use

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

disorder in remission.  Because the ALJ's evaluation of the medical opinions pertaining to Plaintiff's chronic lumbar pain, neuropathy, and Reynaud's disease is not supported by substantial evidence, the ALJ erred. This matter is remanded for further proceedings.

## I.     Background

On January 25, 2019, claiming an inability to work due to the physical and mental impairments listed above, Plaintiff applied for benefits under Title 2, alleging an onset date of September 1, 2016.[2] On February 14, 2019, Plaintiff filed an application for benefits under Title 16 claiming the same impairments and onset date.[3]

After the agency denied benefits at the initial and reconsideration stages,[4] ALJ Marie Palachuk held a telephone hearing in March 2021, at which Plaintiff,  two medical experts, and a vocational expert testified.[5] On April 1, 2021, the ALJ issued an unfavorable decision

---

[2] AR 311.

[3] AR 313.

[4] AR 163, 171, 175.

[5] AR 49-89.

denying Plaintiff's claims.[6] Plaintiff filed a timely request for review,[7] and on February 1, 2022, the Appeals Council denied Plaintiff's appeal.[8] Plaintiff filed suit in this Court, and on August 15, 2023, this Court remanded the case for further proceedings.[9] On January 17, 2024, the Appeals Council remanded the case to the ALJ, consistent with this Court's order.[10]

On October 31, 2024, Plaintiff and her counsel appeared before ALJ Palachuk for a hearing.[11] Plaintiff testified, and a vocational expert testified.[12]

---

[6] AR 14-38.

[7] AR 306

[8] AR 1-6.

[9] AR 1116, 1146; E.D. Wash. No. 4:22-cv-5046-EFS.

[10] AR 1151.

[11] AR 1052-1076.

[12] *Id.*

Plaintiff testified that her ability to stand and walk had not changed from the 15 minutes previously testified to.[13] She said sitting was the same with a need to stretch for 5 minutes after sitting for 20 minutes.[14] Plaintiff stated that she continued to feel a sliding and instability of the disc in her back with a crunching sound and that she would be bed-ridden for 2-4 days a month.[15] She said that when the disc in her back slide it would hit a nerve and that she could not lift more than 10 pounds.[16] She said that she also needed to recline and elevate her feet due to neuropathy and swelling for 30 minutes up to 5 times a day.[17]

Plaintiff testified that she did not have side effects from her medication because she had stopped taking her medication.[18] She

---

[13] AR 1056-1057.

[14] AR 1056-1057.

[15] AR 1057-1058.

[16] AR 1058-1059.

[17] AR 1059.

[18] AR 1059-1060.

testified that her Raynaud's limited her ability to use her hands when it is cold because her hands would be white with pain and numbness.[19] She said that the condition affected her in the winter.[20] She states that she had a relapse of her alcoholism but had been sober for the last 8 months.[21] Plaintiff testified that her depression had worsened and that she was having a hard time showering and going out.[22] She said that she and her children were in a shelter.[23] She had been in an online school but was suspended after she was psychiatrically hospitalized and had too many absences.[24] She said that her children are not in the shelter with her but they visit her there.[25]

---

[19] AR 1061.

[20] AR 1062-1063.

[21] AR 1063.

[22] AR 1064.

[23] AR 1066.

[24] *Id*.

[25] AR 1067-1068.

1    The ALJ issued a decision denying benefits.[26] The ALJ found

2    Plaintiff's alleged symptoms unsupported by the medical evidence and

3    her activities.[27] As to the medical opinions, the ALJ found:

- The opinions of consultative examiner Lucy Peterson, MD, to
  be unpersuasive.

- The opinions of medical expert John F. Kwock, MD,[28] to be
  partially persuasive.

- The opinions of state agency evaluators Merry Alto, MD, and
  Norman Staley, MD, to be partially persuasive.

- The opinions of consultative examiner Linda Lindman, PhD, to
  be generally persuasive.

---

[26] AR 1122-1051. Per 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)–(g), a
five-step evaluation determines whether a claimant is disabled.

[27] AR 1034-1038.

[28] The resume reflected in the file is for John F. Kwock, MD, although
the medical expert who testified via telephone at the hearing identified
himself as "Dr. M. Francis Kwock."

- The opinions of treating source Angela Combs, ARNP, to be unpersuasive.

- The opinions of medical expert Kent Layton, PsyD, to be very persuasive.

- The opinions of state agency evaluators Jan Lewis, PhD, and Bruce Eather, PhD,  to be not somewhat persuasive.[29]

Although the ALJ did not make a finding in the decision as to Plaintiff's date last insured, the file indicates that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2021.[30] As to the remainder of the sequential disability analysis, the ALJ found:

- Step one: Plaintiff did not engage in substantial gainful activity since September 1, 2016, the alleged onset date.

- Step two: Plaintiff had the following medically determinable severe impairments:  congenital pars defect, neuropathy in the feet, major depressive disorder, generalized anxiety disorder,

---

[29] AR 1038-1040.

[30] AR 92.

attention-deficit hyperactivity disorder, and substance use disorder.

- Step three: if Plaintiff ceased her substance use, she does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments and specifically considered Listings 1.15, 11.14, 12.04, and 12.06.

- RFC: Plaintiff has the RFC to perform work at the light level with the following limitations:

> [Plaintiff] could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; she could never climb ladders, ropes, or scaffolds; she should avoid concentrated exposure to extreme cold and hazards; she could understand, remember, and carry out simple, routine tasks; she could maintain concentration, persistence, and pace for two-hour intervals between regularly scheduled breaks; she would need a predictable work environment with no judgment, decision-making, or fast-paced (e.g., assembly line) work; she could have occasional, superficial interaction with the public and superficial (i.e., non-collaborative) interaction with co-workers; and she should not work with crowds.

- Step four: Plaintiff does not have past relevant work.[31]

- Step five: Plaintiff is capable of performing work as a routing small parts assembler, laundry aide, and office cleaner.[32]

Plaintiff timely requested that this Court review the denial of disability.[33]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error" and such error impacted the nondisability determination.[34] Substantial evidence is

---

[31] AR 1041, 1071-1072. The ALJ's decision states at finding 7 that Plaintiff can perform past relevant work, but this seems to be an error because at the hearing the ALJ stated there was no past relevant work and the decision states at finding 9 that transferability of job skills is not an issue because Plaintiff has no past relevant work.

[32] AR 1028-1041.

[33] ECF No. 1.

[34] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g); *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012),

1

2

"more than a mere scintilla but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."[35]

### III.  Analysis

Plaintiff argues the ALJ erred when evaluating the opinions of

consultative examiner Lucy Peterson, MD, and treating source Angela

_____

*superseded on other grounds by* 20 C.F.R. §§ 404.1520(a), 416.920(a)

(recognizing that the court may not reverse an ALJ decision due to a

harmless error—one that "is inconsequential to the ultimate

nondisability determination").

[35] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978,

980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028,

1035 (9th Cir. 2007) (The court "must consider the entire record as a

whole, weighing both the evidence that supports and the evidence that

detracts from the Commissioner's conclusion," not simply the evidence

cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d

383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does

not indicate that such evidence was not considered[.]").

Combs, ARNP, erred in rejecting Plaintiff's subjective complaints, and erred in her finding at step five as a result.[36] The Commissioner argues the ALJ's findings regarding the medical opinion evidence and Plaintiff's subjective claims are supported by substantial evidence, and that the step-five finding was therefore not flawed.[37] As is explained below, the ALJ erred when evaluating the medical opinions of Dr. Peterson; on remand, the ALJ is to reevaluate the medical opinions, develop the record as needed, and properly consider Plaintiff's testimony.

## A.    Medical Opinions: Plaintiff establishes consequential error.

Plaintiff argues the ALJ erred by failing to properly consider the supportability and consistency of Dr. Peterson's opinions, by failing to consider Dr. Peterson's examinations findings regarding a pars defect, by finding that Plaintiff was not compliant with treatment when she complied with the treatment recommended by Dr. Peterson, and by

---

[36] ECF No. 6.

[37] ECF No. 7.

focusing on the fact that Dr. Peterson's opinions were inconsistent with those of medical expert Dr. Kwock, yet Dr. Kwock did not consider Plaintiff's pars defect or neuropathy and this was the basis of Dr. Peterson's opined limitations. The Commissioner argues the ALJ reasonably articulated her reasoning adequately and gave an adequate explanation of why she found the opinions of Dr. Kwock and the state agency consultants persuasive.  After considering the medical opinions in question, the medical evidence of record, and the reasons given by the ALJ to discount Dr. Peterson's opinions, the Court determines the ALJ's evaluation of the medical opinions of Dr. Peterson is not supported by substantial evidence.

1.  Standard

The ALJ must consider and articulate how persuasive she found each medical opinion and prior administrative medical finding, including whether the medical opinion or finding was consistent with and supported by the record.[38] The factors for evaluating the

---

[38] 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

persuasiveness of medical opinions include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[39] Supportability and consistency are the most important factors.[40] When considering the ALJ's findings, the Court is constrained to the reasons and supporting explanation offered by the ALJ.[41]

The regulations define these two required factors as follows:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[42]

---

[39] 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)–(5).

[40] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

[41] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

[42] 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)–(2).

2. <u>Dr. Peterson's Examination Record and Opinions, and Other Relevant Medical Records</u>

a. <u>*Dr. Peterson's examination and opinions*</u>

On June 13, 2019, Lucy Peterson, MD, examined Plaintiff at the request of the Commissioner.[43] Dr. Peterson stated that prior to the examination she reviewed a September 28, 2018 medical evaluation performed by Dr. Thorp of Trios Healthcare Clinic, and a treatment note from a December 20, 2018 office visit with Srinidas Mascal, MD, of Tri-City Community Healthcare, and stated that there were x-rays performed that day that she would review.[44] Plaintiff presented with physical complaints of chronic low back pain and a "pars defect," and a recurrent ventral hernia, as well as mental impairments that Dr. Peterson would not evaluate.[45] Plaintiff advised that she suffered from a pars defect and low back pain for many years but had an exacerbation 8 years prior that required her to be hospitalized and

_____

[43] AR 868-875.

[44] AR 869.

[45] *Id.*

placed on bed-rest.[46] Plaintiff was advised not to do heavy lifting and took a light duty job but developed a ventral hernia 3 to 4 years prior.[47] Plaintiff reported that her back pain was exacerbated by standing and by sitting without proper support and frequent shifting.[48] Plaintiff reported that she underwent hernia repair surgery in 2016 but the hernia recurred and she was presently awaiting surgery.[49]

Plaintiff reported that she lived with a friend in a home with no steps and would have trouble if there had been steps.[50] She stated that she can do light cooking without prolonged standing, can do selective vacuuming, can do some grocery shopping, is not able to take out trash or do yard work, and tries to assist in watching the children.[51] She reported that her current medications were Prozac, Vivitrol injections,

---

[46] AR 869-870.

[47] AR 870.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

Adderall, trazadone, and Deplin.[52] Plaintiff also reported that she was

an alcoholic in an 8-month remission and did not use other

substances.[53]

On examination, Plaintiff was 5'3" and weighed 140 pounds, her

blood pressure was 121/78 but her pulse was elevated at 108, and her

vision was 20/20 in both eyes.[54] Plaintiff's eyes, ears, nose throat, neck,

and pulses were within normal limits.[55] Plaintiff ambulated slowly and

with mild pain, and grasped a table to stand, shifted her weight several

times, and displayed pain when sitting up from the exam.[56] Plaintiff

could use her hands without problems, was able to tandem walk and

bend with a brace, and was able to half-squat.[57] SLR was negative

when sitting and on the right supine but was positive on the left supine

---

[52] AR 870-871.

[53] AR 871.

[54] *Id.*

[55] AR 872.

[56] *Id.*

[57] *Id.*

with pain and muscle spasm noted.[58] Motor function was normal and range of motion in the neck, back, shoulders, elbows, wrists, thumb/fingers, hips, knees, and ankles was normal.[59] The cardiovascular and respiratory systems and abdomen were within normal limits but on neurological testing there was decreased sensation bilaterally in the feet from mid-foot to toe consistent with neuropathy.[60] On examination, there was tenderness to palpation and compression of the right and left paravertebral regions and the midline lumbosacral regions, and there was "crunching" and instability of the pars defect on palpation.[61]

Dr. Peterson diagnosed lumbosacral spine chronic low back pain with associated pars defect, which she found evident on examination and opined that there was a poor prognosis; a ventral hernia evidence by medical records and opined that there was a fair prognosis; and

---

[58] *Id.*

[59] AR 872-873.

[60] AR 873.

[61] *Id.*

mental illness, which she did not evaluate during her examination.[62] Dr. Peterson opined that Plaintiff was limited to less than 2 hours of standing and walking due to chronic lumbosacral sprain, pars defect, and possible degenerative joint disease.[63] Dr. Peterson opined that Plaintiff was limited to less than 2 hours of sitting due to the pars defect and chronic lumbosacral sprain.[64] She opined that Plaintiff should wear a medically necessary Velcro elastic brace at all times.[65] Dr. Peterson opined that as a result of her pars defect and chronic lumbosacral sprain Plaintiff would be limited to lifting 10 pounds occasionally and frequently; could occasionally crawl, kneel, and climb; could frequently crouch; and could never stoop.[66] She opined that Plaintiff had no limitation in balancing or manipulative activities.[67]

---

[62] *Id.*

[63] AR 874.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

Dr. Peterson opined that Plaintiff had no limitation to working around chemicals, dust, fumes, or gases; but should be limited from working at heights or around heavy equipment due to her pars defect and lumbosacral sprain.[68]

### b.    *Diagnosis of Reynaud's Disease*

On March 1, 2022, Plaintiff presented to Maria Hussain, MD, of Molina Healthcare of Washington, to establish care and for treatment of musculoskeletal concerns.[69] Plaintiff reported diagnosis with a pars defect ten years prior, as well as aching back pain that was worse at the end of the day and for which she wears as a back brace.[70] Plaintiff also reported that she had bilateral numbness and tingling in her hands and feet for a number of years that had been treated in the past with gabapentin.[71] Plaintiff reported that when exposed to cold her

---

[68] *Id.*

[69] AR 1385.

[70] AR 1388.

[71] *Id.*

hands and feet would turn blue/white.[72] Examination results were

normal, with the exception of sharply demarcated pallor at fingertips.[73]

Dr. Hussain diagnosed Raynaud's phenomenon, neuropathy, a history

of alcohol abuse, bilateral swelling of the fingers, and chronic low back

pain.[74]

      c.    *Dr. Kwock's hearing testimony*

The following exchange took place on the record at the March

2021 hearing:

> (The Witness, M. FRANCIS KWOK, having been first duly
> sworn, testified as follows:)

> EXAMINATION OF WITNESS BY ADMINISTRATIVE
> LAW JUDGE:

> Q: Doctor, if you could begin, please, by identifying yourself,
> providing your name and your practice location.

> A: Yes, my full name is Dr. M. Francis Kwok (PHONETIC). I
> work as an independent contractor to a firm called Mednick
> Associates out of Connecticut.

---

[72] *Id.*

[73] *Id.*

[74] AR 1388-1389.

Q: Doctor, we have your qualifications marked under Exhibit 44F. Is that document accurate?[75]

A: It is.

Q: Have you ever treated or examined the claimant?

A: I have not.

Q: Have you discussed the case with the claimant, her attorney or with me?

A: I have not.

Q: Have you reviewed the medical records?

A: I have.

ALJ: Counsel any objections to Dr. Kwok as an expert?

ATTY: No.

Q: Okay, then, Doctor, if you could please go through these records with us identifying and discussing any physical impairments.

A: Yes. With the record I have, the single musculoskeletal, medically discernible impairment or condition that the claimant does have is that she does have a mallet (PHONETIC) finger present in the ring finger of the left hand, but that is the single muscle skeletal entity that I can really identify.

---

[75] As noted above, the exhibit referenced identifies John F. Kwock, MD.

Q: And doctor, would that condition meet or equal any listings used by Social Security?

A: Singularly, it would not meet a listing, nor would it in combination completely equal a listing, so she neither met nor equaled a listing.

Q: Would it result in any functional limitations?
A: The limitations that it would result in are very mild. I think -- or I don't think they constitute a material interference with day-to-day function.

ALJ: Thank you, Doctor. I don't have any further questions for you. Let me see if Mr. Hatfield would like to ask any questions. Mr. Hatfield?

EXAMINATION OF WITNESS BY ATTORNEY:

Q: Doctor, are you evaluating also the neuropathy or the neuropathy in the feet? She was prescribed gabapentin.

A: Well, you know, in some sense, musculoskeletal conditions do sometimes incorporate the problems associated with neuropathies. But I'm board certified in surgery and so if she's got a neuropathy alone, I would not have considered it. My comments are limited to the musculoskeletal system.

Q: Okay.

ATTY: I don't have any other questions.

ALJ: Thank you, Doctor. We're going to go ahead and excuse you. Bye-bye.[76]

---

[76] AR 54-56.

DISPOSITIVE ORDER - 22

### 3.    The ALJ's Consideration of Dr. Peterson's Opinions

The ALJ found the opinion of Dr. Peterson to be not persuasive.

The ALJ articulated the following reasoning to support her

decision to discount Dr. Peterson's opinion:

> Lucy Peterson, M.D., conducted an independent physical
> evaluation of the claimant in June 2019. She opined the
> claimant could stand and walk for less than two hours and
> sit less than two hours in an eight-hour day (36F). She
> noted the claimant used an elastic back brace and opined it
> was medically necessary at all times. She further stated the
> claimant could lift and/or carry 10 pounds occasionally and
> frequently. She opined the claimant could occasionally
> crawl, kneel, climb, and reach; frequently crouch; and never
> stoop. She also stated the claimant would be limited from
> working at heights or around heavy machinery. Dr.
> Peterson opined the claimant would be limited from
> working around excessive noise, although she acknowledged
> that such a limitation was related to the claimant's mental
> impairments, which she did not fully evaluate.
>
> The United States District Court noted that the
> undersigned previously found Dr. Peterson's opinion
> unpersuasive due to inconsistencies with the examination
> findings, but it stated that there was no consideration of
> supportability factors or explanation of how any evidence
> contradicted Dr. Peterson's opinion. The undersigned now
> rectifies that error, although Dr. Peterson's opinion is still
> considered unpersuasive. First, the undersigned
> acknowledges that the claimant's pars defect and
> corresponding back pain reduces her functionality, but the
> results of Dr. Peterson's examination do not support a
> restriction to no more than two hours of sitting, standing, or
> walking. Although she may have ambulated slowly and with

a mild amount of pain over 20 to 30 feet during Dr. Peterson's evaluation, this alone does not constitute objective evidence of a limitation to only two hours of standing or walking in an eight-hour day. The claimant's medical records do not include imaging showing any significant lumbar disorder aside from the pars defect. The claimant's course of treatment over the years is sporadic, and she does not necessarily follow through with recommended measures as described above. John Kwock, M.D., the medical expert at the May 2021 hearing, reviewed Dr. Peterson's opinion and evaluated the claimant's musculoskeletal conditions. He opined that her only medically determinable impairment involved one finger on her left hand, even after reviewing Dr. Peterson's evaluation. The undersigned finds Dr. Kwock's opinion only partially persuasive, as the medical evidence clearly supports the pars defect and neuropathy as severe impairments, but he is an orthopedic surgeon with specialized expertise in musculoskeletal and neuropathic impairments. He also had considerably more evidence available for his review, as Dr. Peterson only considered two medical visits in September and December 2018 without any medical imaging (36F/1).[77]

Plaintiff argues that the ALJ erred in both her assessment of the supportability factor and the consistency factor. The Court agrees.

With regard to the supportability factor, the ALJ has acknowledged that Plaintiff suffers from a pars defect and that Dr. Peterson explained that her opined limitations were based upon

---

[77] AR 1038-1039.

the effects of the pars defect.[78] She states that the results of the
examination do not support the opined restrictions and states that the
only abnormality shown on examination was Plaintiff slow and painful
ambulation.[79] This is error.  On examination, Dr. Peterson noted that
Plaintiff needed to use supports to rise from a seated position, that
Plaintiff had a positive SLR on the left with objective muscle spasms
present, and most importantly, that the effects of Plaintiff's pars defect
were obvious on examination with "crunching" that could be both heard
and felt.[80] Dr. Peterson stated that the instability in Plaintiff's spine
could be felt.[81]

A pars defect, also known as spondylolysis, is a condition in which
there is a stress fracture of the pars interacticularis bones which form
between two vertebrae and prevent them from separating and causing

---

[78] AR 1038.

[79] *Id.*

[80] AR 872-873.

[81] AR 873.

the disc between to shift.[82] When a disc presses on a nerve as a result of the condition, it will cause sharp shooting pains into the buttocks and legs along the sciatic nerve.[83] The most common treatments for pars defect are rest, medication, steroids, physical therapy, and bracing.[84] In the worst cases, when the condition does not respond to conservative measures, a spinal fusion might be recommended.[85]

The ALJ's articulated reasoning failed to address that Dr. Peterson's opined limitations were consistent with a positive SLR suggestive of nerve root compromise at the L5 level.  It also failed to address the fact that the underlying diagnosis of a pars defect, which the ALJ acknowledged as a severe impairment, was likely to result in nerve root compromise.  Instead, the ALJ's articulated reasoning focused on the fact that the pars defect was the only musculoskeletal

---

[82] *Spondylolysis: Causes, Treatment & Prevention*, Cleveland Clinic, www.clevelandclinic.org (last viewed July 10, 2025).

[83] *Id.*

[84] *Id.*

[85] *Id.*

impairment indicated by the examination results, and failed to consider the effects that single impairment might be expected to cause in any meaningful way.

Additionally, the ALJ failed to consider that Dr. Peterson's examination indicated neuropathy which was consistent with later diagnosed Reynaud's disease.[86]  This error bled over into the ALJ's consideration of the consistency factor, which was also flawed. Notably, the medical expert who testified at the first hearing offered his testimony prior to Plaintiff's Reynaud's diagnosis.  It is unclear whether a review of the later records would have influenced the expert's testimony because he stated that he did not consider neurological impairments.[87]

The primary reason that the ALJ articulated for her findings regarding the consistency factor as to Dr. Peterson's opinions – that they were inconsistent with those of the medical expert - was flawed because the medical expert clearly stated that he did not consider

---

[86] AR 1388-1389.

[87] AR 55-56.

Plaintiff's neurological impairments and he failed to consider the pars defect, which the ALJ herself found to be a severe impairment.  The ALJ thus acknowledged that Dr. Kwock's opinion was flawed and did not address an underlying severe impairment, which by definition would be expected to cause limitations in her ability to perform basic work activities,[88] but then used that flawed opinion to discount Dr. Peterson's medical opinion because it included additional limitations.  This is clear error.

There is no question that Plaintiff suffered from a pars defect, nor is there question that the medical expert who testified at the hearing did not consider that condition.  The ALJ's failure to consider the objective evidence and its consistency with Dr. Peterson's findings of tenderness to palpation, positive straight leg raising on the left when supine, and an obvious instability and "crunching" of the vertebrae at the L5 level was consequential.

---

[88] AR 1038.  See also 20 C.F.R. §§ 404.1521, 416.921.

While the ALJ need not cite to and discuss every piece of evidence,[89] the ALJ's failure to discuss this evidence was error.

The ALJ's supportability evaluation and consistency evaluation are lacking and are not supported by substantial evidence. The Court concludes that a remand is warranted for the ALJ to properly evaluate Dr. Peterson's opinions with due consideration of both the supportability and consistency factors. Because the medical expert who testified at the first hearing did not consider the pars defect and did not have access to later records indicating Reynaud's disease, the Court directs that on remand the ALJ is not to utilize the medical expert's testimony in his or her consideration of Dr. Peterson's opinions. The Court further recommends that the ALJ on remand

---

[89] *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (stating that "in interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence" (quotation marks omitted)).

develop the record by either scheduling a second consultative examination or by calling a medical expert to testify.[90]

**B.    Symptom Reports:  This issue is moot.**

Plaintiff argues that the ALJ failed to provide valid reasons for discounting her subjective complaints.  Because the Court has remanded the case with direction that the ALJ re-evaluate the medical opinions and Plaintiff's impairments, the ALJ will be required to re-evaluate Plaintiff's symptom reports.  This issue is therefore moot.

**C.    Step Five:  Plaintiff established consequential error.**

Plaintiff argues the ALJ's step five finding was flawed due to errors in considering the medical opinion evidence and in evaluating Plaintiff's subjective complaints.  Because Plaintiff established

---

[90] Should the ALJ develop the record on remand by scheduling a consultative examination, the ALJ is directed to provide the consultative examiner with a copy of Dr. Peterson's report, all relevant imaging results and objective testing regarding Plaintiff's pars defect, and Dr. Hussains's findings and diagnosis of Reynaud's syndrome.

consequential error in considering the medical opinion evidence, she has established error at step five.

## D.    Remand for Further Proceedings

Plaintiff submits a remand for payment of benefits is warranted. The decision whether to remand a case for additional evidence, or simply to award benefits, is within the discretion of the court."[91] When the court reverses an ALJ's decision for error, the court "ordinarily must remand to the agency for further proceedings."[92]

The Court finds that further development is necessary for a proper disability determination. Here, it is not clear what, if any, additional limitations are to be added to the RFC.

---

[91] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

[92] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke*  379 F.3d at  595  ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

# IV.   Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—her evaluation of the medical opinions, Plaintiff's impairments, and Plaintiff's subjective complaints.

Accordingly, **IT IS HEREBY ORDERED**:

1.   The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)**.

2.   The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 6 and 7**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 24th day of July 2025.


*Edward F. Shea*
_____
EDWARD F. SHEA
Senior United States District Judge